# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TUCCIO DEVELOPMENT, INC.,  :
           :
     Plaintiff,  :
           :    No. 08cv1016 (MRK)
v.           :
           :
TOWN OF BROOKFIELD et al.,  :
           :
     Defendants.  :

## MEMORANDUM OF DECISION

Currently pending before the Court are motions for summary judgment in three related cases that were consolidated for pre-trial purposes: *Tuccio Development, Inc. v. Town of Brookfield et al.* ("*Tuccio I*"), No. 08cv1016 (filed July 8, 2008); *Tuccio Development, Inc. et al. v. Town of Brookfield et al.* ("*Tuccio II*"), No. 08cv1610 (filed Oct. 21, 2008); and *Tuccio Development, Inc. et al. v. Town of Brookfield et al.* ("*Tuccio III*"), No. 09cv898 (filed June 8, 2009).  All three cases involve what can only be described as a long-running feud between Tuccio Development, Inc. ("Tuccio Development") and related companies, on the one hand, and several officials and municipal bodies of the Town of Brookfield, Connecticut, on the other, relating to Tuccio Development's construction of a residential subdivision known as Whispering Glen.  Defendants in all three cases have moved for summary judgment, arguing that the undisputed facts entitle them to judgment as a matter of law.  *See Tuccio I*, Defs.' Mot. for Summ. J. [doc. # 55]; *Tuccio II*, Defs.' Mot. for Summ. J. [doc. # 37]; *Tuccio III*, Defs.' Mot. for Summ. J. [doc. # 24].  The Court agrees with Defendants, and therefore the motions for summary judgment in all three cases are GRANTED.  Given that the facts and arguments raised in all three cases are extremely similar, the Court has written a single

1

opinion addressing the pending motions for summary judgment in all three cases.

## I.      Factual and Procedural Background

The following facts are drawn from the record before the Court; unless otherwise noted, they are undisputed.  Additional facts may be introduced below as needed to address individual claims.

On August 7, 2002, non-party Craig Froelich submitted a subdivision application and plan to the Brookfield Planning Commission ("Planning Commission") and an application to the Brookfield Inland Wetlands Commission ("Wetlands Commission") for a permit to undertake regulated activity (the building of the 15-lot subdivision) within protected wetlands and near a watercourse, the Fred Beers Brook.  The Brook flows through the subdivision, exits to the south, and then traverses land owned by Larry Miller – the current Chairman of the Wetlands Commission and a defendant in *Tuccio I* and *II* – on which Mr. Miller lives with his family.  After exiting Mr. Miller's property, the Brook travels less than a mile before depositing in Lake Lillinonah.

Shortly after receipt of Mr. Froelich's permit application, the Wetlands Commission approved it, but with 13 stipulations.  Most relevant to this litigation, those stipulations included the following:

1.  No more than three lots could be in progress at once;

2.  The applicant was required to hire, at his expense, an environmentalist to oversee the project until the last lot was sold, but for a minimum of 3 years;

3.  The applicant had to submit a full erosion control plan for the Wetlands Commission's approval at a pre-construction meeting; and

4.  If the Wetlands Commission deemed necessary additional sedimentation controls and stabilization at any point in the construction, the applicant was required to implement those measures "promptly."

*See* Sept. 25, 2002 Letter from Brookfield Land Use Office to Craig Froelich re: Inland Wetlands

Approval, Ex. C to Daniel Aff. [doc. # 57-1].[1]

A few months later, on November 7, 2002, the Planning Commission approved Mr. Froelich's subdivision application and plan, again with stipulations. Most relevant to this dispute are the following stipulations:

1. The Wetlands Commission's stipulations for the wetlands permit were expressly incorporated by reference;

2. A bond of $13,077 was required as security for completion of the wetlands safeguards set forth in the wetlands permit;

3. A bridge ("the Bridge") meeting certain specifications was to be built over Fred Beers Brook;

4. An additional bond of $720,000 was to be posted with the Town in the form of irrevocable letter of credit; and

5. The applicant was required to agree to construct and complete all physical improvements set forth in the Approved Plan.

*See* Nov. 7, 2002 Letter from Brookfield Land Use Office to Craig Froehlich re: Subdivision Application Approval ("the Approved Plan"), Ex. D to Daniel Aff. [doc. # 57-1]. In accordance with § 234-305 of the Brookfield Subdivision Regulations, *see* Ex. A to Daniel Aff. [doc. # 57-1], and under authority granted by Conn. Gen. Stat. § 8-26c(c), the subdivision approval was valid for five years, although the Planning Commission had the discretionary authority to extend that period upon the applicant's motion.

On April 28, 2004, before any construction had begun, Tuccio Development – a plaintiff in all three cases – purchased the approved subdivision from Mr. Froelich. On June 4, 2004, Tuccio Development entered into a Subdivision Plan Bond and Agreement ("Bond Agreement") with the Town of Brookfield, pursuant to which Tuccio Development agreed, *inter alia*, to post the required

---

[1] Unless otherwise indicated, all references to the record are to documents filed in *Tuccio I*,

bond ("the Bond"), which it did in the form of an irrevocable letter of credit, and to complete all work required by the Approved Plan.  *See* Bond Agreement, Ex. E to Sienkiewicz Aff. [doc. # 57-4].

Two years later, on June 6, 2006, Edward Tuccio, on behalf of Tuccio Development, filed a formal request with the Planning Commission for the release of $603,500 of the Bond.  By this point, Tuccio Development had completed some of the construction called for in the Approved Plan, including the Bridge, but the Bridge was not constructed to specification.  Brookfield's Director of Public Works and Town Engineer, Ron Klimas – a defendant in *Tuccio I* and *II* – reviewed Mr. Tuccio's request, ultimately recommending to the Planning Commission that it release only $553,344 of the Bond.  One reason Mr. Klimas did not recommend the release of the requested amount of $603,500 was that the Bridge was not yet to specification, as it did not have the head walls and wing walls made of pre-cast concrete called for by the Approved Plan; instead, the Bridge had an earth slope covered with boulders and cobbles.  *See* Klimas Aff. [doc. # 57-3] ¶ 13.  The Bridge is a primary dispute in all three of the *Tuccio* cases.  None of Plaintiffs contests that this was the state of the Bridge in 2006 or the Bridge remained contrary to specification throughout all times relevant to all three cases.  However, Plaintiffs argue that prior to the June 2006 request for the bond's partial release, Mr. Klimas had implicitly approved the Bridge as constructed by failing to advise Tuccio Development that the Bridge was inadequate despite his frequent observations of it. *See* E. Tuccio Cont. Dep. on Oct. 28, 2009 [doc. # 58-6] at 208-10.

In any event, the Planning Commission voted 5-0 on June 15, 2006 to accept Mr. Klimas' recommendation, forwarding the same recommendation to the Board of Selectmen (of which *Tuccio I* defendant Jerry Murphy was the First Selectman until December 1, 2007; *Tuccio III* defendant

_____

although, with few exceptions, the record in each case is virtually identical.

Robert Silvaggi has been the First Selectman since that time).  The Board of Selectmen voted 3-0 to accept the Planning Commission's recommendation, releasing $553,344 of the Bond, leaving $166,656 of the original amount as security for Tuccio Development's completion of the construction required in the Approved Plan.

Also in June 2006, Katherine Daniel – a defendant in *Tuccio I* and *II* – was hired as Brookfield's Wetlands Enforcement Officer.  Approximately ten months later, in late April 2007, Ms. Daniel inspected the Whispering Glen subdivision and observed erosion problems that she believed were caused by Tuccio Development's inadequate erosion control measures.  Ms. Daniel reported her observations to the Wetlands Commission on April 23, 2007.  The record is not entirely clear, but shortly thereafter either Ms. Daniel or the Wetlands Commission issued a summons for Tuccio Development to appear before the Wetlands Commission at its meeting on May 13, 2007.

Tuccio Development did not take kindly to the summons, to say the least.  On May 13, 2007, one of its attorneys sent Ms. Daniel a letter alleging that she and the Planning Commission were "treating this developer differently from other developers identically situated and in apparent violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution," and stating that "[w]e intend to seek appropriate redress from each individual and entity responsible for these unlawful actions."  *See* Letter dated May 13, 2007, Ex. A to Sienkiewicz Aff. [doc. # 57-4].  Plaintiffs argue in these lawsuits that Ms. Daniel was acting in response to pressure from Mr. Miller, the Wetlands Commission Chairman and a downstream neighbor of the Whispering Glen subdivision, although, as explained below, Plaintiffs have no evidence to support this claim.  The record is unclear as to whether or not Tuccio Development actually appeared at the May 13, 2007 Wetlands Commission meeting, but on May 16, 2007, Ms. Daniel, at the direction of

the Wetlands Commission, issued Cease & Restore Order to Tuccio Development.  *See* Daniel Aff. [doc. # 57-1] ¶ 23.

A few weeks later, on July 5, 2007, and after a heavy rain that allegedly damaged his property, Mr. Miller filed a formal complaint with Ms. Daniel regarding Whispering Glen's alleged non-compliance with its permit and the Wetlands regulations.  *See id.* ¶ 25.  Ms. Daniel says that Mr. Miller filed this complaint as a private citizen, *see id.*, but Plaintiffs argue that Mr. Miller was abusing his power as the Chairman of the Wetlands Commission.  Mr. Miller admits in his deposition testimony that this was not the first time that he had brought issues regarding the Whispering Glen to the attention of Ms. Daniel (and prior Wetlands Enforcement Officers), but he says that this was the first time that the subdivision's non-compliance with the wetlands' regulations led to damage of his property.  Therefore, from this point forward, Mr. Miller recused himself by physically leaving Wetlands Commission meetings whenever issues relating to Whispering Glen were discussed.  *See* Miller Dep. [doc. # 57-9] at 28.  Plaintiffs argue that not only should Mr. Miller have recused himself earlier, but this belated recusal was just a façade, and that Mr. Miller was still exerting influence over Ms. Daniel and the other Wetlands Commission members behind the scenes. Here again, however, Plaintiffs have no evidence to substantiate this claim beyond their speculation.

With the expiration of the Approved Plan approaching on November 7, 2007, Tuccio Development requested additional time from the Planning Commission to complete Whispering Glen.  On August 2, 2007, the Planning Commission granted a two-year extension (through November 7, 2009), subject to additional conditions.  Those conditions included that Tuccio Development, no later than November 7, 2007, post an additional $45,000 bond; bring the Bridge up to specifications by correcting the problems with the head wall and wing walls; and correct problems

6

with one or more water quality basins.  *See* Sienkiewicz Aff. [doc. # 57-4] ¶ 11.

On August 13, 2007, the Cease and Restore Order issued on May 26, 2007 was released by the Wetlands Commission.  Also on that date, an attorney for Tuccio Development sent a second letter to Ms. Daniel, purporting to give "you and your colleagues one last opportunity to cease and desist" the "disparate treatment" of Tuccio Development "[b]efore we institute litigation." *See* Letter dated August 13, 2007, Ex. B to Sienkiewicz Aff. [doc. # 57-4].  Two days later, Mr. Jeffrey Sienkiewicz, an attorney retained by the Planning Commission and Wetlands Commission, responded to both letters addressed to Ms. Daniel with a letter containing a general denial of wrongdoing.  *See* Letter from Jeffrey Sienkiewicz dated August 15, 2007, Ex. C to Sienkiewicz Aff. [doc. # 57-4].

At the Planning Commission's regular meeting on November 1, 2007, Mr. Klimas reported that despite the stipulations on the two-year extension of the Approved Plan, Tuccio Development had not yet posted the bond or fixed the head/wing walls of the Bridge, and had "rip rapped" only one water quality basin.  In response, the Planning Commission voted to recommend that the Board of Selectmen call the Bond as of November 8, 2007 for Tuccio Development's failure to fulfill the conditions of the two-year extension of the Approved Plan.  *See* Sienkiewicz Aff. [doc. # 57-4] ¶ 12.  The Board of Selectmen accepted this recommendation on November 5, 2007, calling the Bond as of November 8.  *See id.* ¶ 13.  On November 15, 2007, the Planning Commission voted 5-0 to record a Notice of Expiration of the Whispering Glen subdivision.  *See id.* ¶ 14.

Clearly aware of and concerned about these decisions, Edward Tuccio, a principal of Tuccio Development, and Raymond Bershstein, one of its attorneys, attempted to contact First Selectmen Murphy to discuss the matter.  On November 20, 2007, Attorney Sienkiewicz, at the request of Mr.

Murphy, responded via letter to Attorney Bershstein, informing him that Mr. Murphy "has decided against communicating with Mr. Tuccio, as the Planning Commission has exclusive statutory jurisdiction over the subdivision and is not subject to the direction or control of the Board of Selectmen.  Mr. Murphy believes that Mr. Tuccio's concerns can only be resolved through the Planning Commission."  Letter from Jeffrey Sienkiewicz dated Nov. 20, 2007, Ex. D to Sienkiewicz Aff. [doc. # 57-4].

The next day, Tuccio Development and two related entities, D&T Guerra, LLC and Tuccio Custom Homes (both Plaintiffs in *Tuccio II*, and hereinafter referred to as the "State Court Plaintiffs") filed an administrative appeal in Connecticut Superior Court against the Planning Commission and the Board of Selectmen, appealing the decisions to call the Bond and to terminate the subdivision.  *See* Compl., *Tuccio Development et al. v. Brookfield et al.*, No. CV-07-4008207S (Conn. Super. Ct. filed Nov. 21, 2007), Ex. F to Sienkiewicz Aff. [doc. # 57-4].  The basis of the appeal was the Plaintiffs' allegations that they had not received notice of the November 1, 2007 Planning Commission meeting, and were therefore deprived of the opportunity to rebut Mr. Klimas' report of the state of the Bridge and the other conditions related to the extension of the Approved Plan.  *See id.*  The State Court Plaintiffs also sought a stay of both of the appealed decisions.  *See* Pls.' Mot. for Temp. Inj., *id.*

This case ("the State Court Action") lasted only a month.  At a hearing before Superior Court Judge Douglas Mintz, the parties reported that they had entered into a stipulation resolving the lawsuit.  *See* Tr. of H'ring, *Tuccio v. Brookfield*, No. CV-07-4008207S (Conn. Super. Ct. Dec. 21, 2007) [doc. # 57-6].  The State Court Plaintiffs were represented at the hearing by Robert Sensale (from Mr. Bershtein's firm), and Mr. Sienkiewicz represented the Board of Selectmen and the

8

Planning Commission.  Mr. Sienkiewicz described the stipulation, Ex. G to Sienkiewicz Aff. [doc. # 57-4] (hereinafter, "the Stipulated Judgment") to Judge Mintz, including a provision regarding the plaintiffs' release of claims they might have had against defendants.  Judge Mintz then canvassed both attorneys as to whether all parties consented to it and whether they believed it to be fair and equitable.  Mr. Sensale confirmed Mr. Sienkiewicz's description as accurate and represented to Judge Mintz that Tina Guerra – a member of D&T Guerra, LLC – had signed the agreement, was familiar with and agreed to its contents, and that she believed it to be fair and equitable.  *See* Tr. of H'ring [doc. # 57-6] at 14-15.  Arthur Tuccio, Jr., representing the other two State Court Plaintiffs, was in attendance at the hearing, and Judge Mintz canvassed him as well.  Arthur Tuccio stated that he was not under the influence of any intoxicating substances; that he had gone over the agreement with his attorney and understood its contents; that he believed the terms to be fair and equitable; and that he was satisfied with the attorney's representation of him and his companies.  *See id.* at 15.  Judge Mintz then stated that he, too, found the agreement to be fair and equitable under all the circumstances and entered judgment pursuant to it.  *See id.* at 16.

The Stipulated Judgment contains the following relevant provisions.  Paragraph 11 required the plaintiffs to release claims against the defendants; ¶ 12 vacated the decisions to terminate the Whispering Glen subdivision and to call the Bond; and ¶ 14 reinstated the two-year extension of the Approved Plan, subject to certain stipulations.  The additional stipulations included the following: in ¶ 1, the payment of $10,000 for a geotechnical engineer to evaluate the Bridge and design any necessary repairs; in ¶ 2, the posting of a $45,000 bond via an irrevocable letter of credit; in ¶ 3, Tuccio Development was required to implement all repairs to the Bridge recommended by the engineer (if any) within 90 days of being provided notice of said recommendations; and in ¶ 5,

Tuccio Development agreed to make certain improvements related to the subdivision's drainage system.  *See* Stipulated Judgment, Ex. G to Sienkiewicz Aff. [doc. # 57-4].  Since the release of claims is only relevant to *Tuccio I*, it is discussed in more detail in that section of the opinion, below.

Thereafter, in March 2008, and in accordance with the Stipulated Judgment, the Planning Commission retained geotechnical engineer Peter Heynen to evaluate the Bridge.  On May 14, 2008, the parties to the State Court Action jointly amended the Stipulated Judgment to provide that Tuccio Development could post the $45,000 bond via cash instead of a letter of credit.  *See* Am. to Stip., Ex. I to Sienkiewicz Aff.  [doc. # 57-4].  This amendment is the only action that has been taken to date with respect to the Stipulated Judgment of the State Court Action.  On May 23, 2008, Mr. Heynen – who the Defendants have designated as an expert in all three cases – issued his report, which concluded that Bridge was not stable or safe as-is.  Mr. Heynen recommended replacing the cobble- and boulder-wing walls with pre-cast concrete, as called for by the original specifications.  *See* Heynen Report, Ex. B to Heynen Aff. [doc. # 57-7].

On July 8, 2008, Tuccio Development filed *Tuccio I* against the Town of Brookfield; the Wetlands Commission; the Brookfield Planning Commission; Mr. Murphy; Mr. Klimas; Ms. Daniel; Mr. Miller; James Vulcano (the Vice Chairman of the Wetlands Commission); and five other individuals.[2]  *Tuccio I* is discussed in more detail below, but it alleges, generally speaking, that the "Defendants have subjected Plaintiff to a pattern of harassment and abuse designed and intended to inflict substantial economic injury upon the Plaintiff with respect to its Whispering Glen development," and describes various actions that were also the subject of the State Court Action. *Tuccio I*, Compl. [doc. # 1].

_____

[2] These five other individuals were dismissed per Plaintiff's motion on May 23, 2009.  *See Tuccio I*,

Two relevant actions took place on September 5, 2008. First, Mr. Klimas sent a notice to Arthur Tuccio, Jr., along with Mr. Heynen's Report, advising him of Mr. Heynen's recommendations calling for the Bridge to be reconstructed. *See* Letter dated Sept. 5, 2008 from Ron Klimas, Ex. A to Klimas Aff. [doc. # 57-3]. In accordance with Item 3(C) of the Stipulated Judgment, the State Court Plaintiffs had 90 days from that point (until approximately December 4, 2008) to complete Mr. Heynen's recommendations regarding the Bridge. Also on September 5, 2008, Ms. Daniel, after a heavy rain, observed that Tuccio Development had failed to maintain adequate soil and erosion controls on Lot 10 of the subdivision. *See* Daniel Aff. [doc. # 57-1] ¶ 30. Ms. Daniel reported this to the Wetlands Commission, who ordered her to issue a Cease & Restore Order pursuant to her authority as the Wetlands Enforcement Officer and ¶ 9 of the Stipulated Judgment. *See id.* ¶ 31. Ms. Daniel did so on September 9, 2008; that Cease and Desist Order was lifted by vote of the Wetlands Commission some six weeks later, on October 20, 2008. *See id.* ¶¶ 31-32.

On or about September 20, 2008 – approximately two weeks after receiving notice of Mr. Heynen's report and recommendations – Tuccio Development quitclaimed its remaining lots in the Whispering Glen subdivision to Tuccio Enterprises, LLC, an entity owned by the same individuals. According to Edward Tuccio this action was to "get by [the Planning Commission] terminating a subdivision." E. Tuccio Cont. Dep. on Oct. 28, 2009 [doc. # 57-11] at 248-49.

The day after the Cease & Restore Order issued on September 5, 2008 was lifted, *Tuccio II* was filed on behalf of Tuccio Development; D&T Guerra, LLC; Tuccio 7, LLC; and Tuccio Custom Homes, LLC against the Town of Brookfield; the Wetlands Commission; Mr. Miller; Mr. Vulcano; Ms. Daniel; and Mr. Klimas. *Tuccio II* is discussed in more detail below, but it essentially alleges

---

Pl.'s Mot. to Dismiss [doc. # 36]; Order [doc. # 37].

that the Defendants retaliated against the *Tuccio II* plaintiffs for the filing of *Tuccio I*, in violation of rights protected by the First Amendment to the U.S. Constitution.  *See Tuccio II*, Compl. [doc. # 1].

About six weeks later, on December 1, 2008 – about three days before the relevant deadline – Mr. Klimas sent a memo to the Planning Commission stating that "no work has taken place for the wingwalls and headwalls for the box culvert [i.e., the Bridge]."  Letter dated Dec. 1, 2008 from Ron Klimas, Ex. B to Klimas Aff. [doc. # 57-3].  During its meeting on December 4, 2008, the Planning Commission adopted a motion to send Attorney Sienkiewicz a letter "to ask for the proper verbiage re: expiration of the subdivision and calling of the bond."  Sienkiewicz Aff. ¶ 27 [doc. # 57-4].  A month later, on January 5, 2009, Robert Sensale, an attorney for Tuccio Development, sent a letter to the Planning Commission and Mr. Sienkiewicz, acknowledging receipt of Mr. Klimas December 1, 2008 memo, and alleging that it was arbitrary, capricious, and unsupported by standard engineering practices.  *See* Letter dated Jan. 5, 2009, Ex. J to Sienkiewicz Aff.  [doc. # 57-4].  Mr. Sensale concluded his letter by requesting that the Town refrain from terminating the subdivision and calling the Bond.  *See id.*

Then on February 9, 2009, the Chairman of the Planning Commission sent a letter to Tuccio Development informing it of a show cause hearing scheduled before the Planning Commission for March 5, 2009.  *See* Letter dated Feb. 9, 2009, Ex. K to Sienkiewicz Aff. [doc. # 57-4].  The letter listed the five items of work required by the Stipulated Judgment that the State Court Plaintiffs had not yet completed and advised that the Planning Commission was considering terminating the subdivision and calling the Bond.  *See id.*  About two weeks later, on February 27, 2009, Mr. Sensale sent a letter to the members of the Brookfield Board of Finance, informing them that the "Planning Department has just sent a notice to my clients threatening a termination of the

subdivision, claiming that certain items of work remain to be done.  The Planning Commission has also threatened to call the performance bond posted to secure site improvements that have already been completed."  *See* Letter dated Feb. 27, 2009, Ex. L to Sienkiewicz Aff. [doc. # 57-4].  Mr. Sensale's letter pointed out the increase in property taxes that had been occasioned by the Whispering Glen subdivision and requested that the Board of Finance members take action to prevent its termination.  *See id.*

The Planning Commission show cause hearing for Whispering Glen was held at the scheduled date and time on March 5, 2009.  No one from Tuccio Development (or any of the other *Tuccio I-III* plaintiffs) attended the hearing except for  Tuccio Development's environmentalist, Peter Young, who was not authorized to speak on its behalf.  *See generally* Mins. of Mar. 5, 2009 Planning Comm'n Meeting, Ex. C to Klimas Aff. [doc. # 57-3]; Sienkiewicz Aff. [doc. # 57-4] ¶ 32. Mr. Klimas reported during the evidentiary portion of the hearing that Tuccio Development had not done the work required by the Stipulated Judgment, despite receiving notice by letter dated September 5, 2008, and that Tuccio Development had not contacted him to request an extension of time to do so.  The Commissioners then discussed the history of the Whispering Glen subdivision and their efforts to gain compliance with the Approved Plan and Stipulated Judgment.  With regard to the Bond, Attorney Sienkiewicz (acting as the Planning Commission's attorney) recommended that the Planning Commission "proceed[] against the letter of credit first, and the cash second," and noted that the Subdivision would have to be terminated before the Bond could be called.  The Planning Commission then voted 5-0 to terminate the subdivision.  Attorney Sienkiewicz read a proposed draft of the Planning Commission resolution calling the bond, which the Planning Commission approved.  The Planning Commission recommended that the Town Engineer prepare a

13

fair and accurate estimate of the costs to complete the subdivision improvements.

Mr. Klimas retired as the Town Engineer and Director of Public Works on March 18, 2009, *see* Klimas Aff. ¶ 4 [doc. # 57-3], and was replaced by non-party Ralph Tedesco.  By letter dated April 1, 2009, Mr. Tedesco informed the Planning Commission that the estimated cost of the work needed to complete the Subdivision improvements was $218,301 (exceeding the combined total of the letter of credit and cash bond, which was $211,656).  *See Tuccio III*, Tedesco Aff. [doc. # 27-9]; Sienkiewicz Aff. [doc. # 57-4]  ¶¶ 33-34.  On May 26, 2009, First Selectman Silvaggi (the only individual Defendant in *Tuccio III*) sent a letter – drafted by Mr. Sienkiewicz, and at the direction of the Board of Selectmen – to Citizen's Bank calling the Bond.  *See* Letter, Ex. M. to Sienkiewicz Aff. [doc. # 57-4]; Sienkiewicz Aff. [doc. # 57-4] ¶ 37.  *Tuccio III* was filed about two weeks later against the Town of Brookfield and Mr. Silvaggi, alleging that the calling of the bond violated the procedural and substantive due process rights of the plaintiffs, Tuccio Development and Tuccio Enterprises, LLC.  *See Tuccio III*, Compl. [doc. # 1].

## II.    Standard

The summary judgment standard is a familiar one.  Granting summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ*., 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment.'"  *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the nonmovant is entitled to have all ambiguities resolved and all inferences drawn in its favor, *see Anderson*, 477 U.S. at 255; *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).  However, if the moving party carries its burden, the non-moving party "may not rely merely on allegations or denials" to survive summary judgment.  Fed. R. Civ. P. 56(e)(2).  Rather, to successfully defeat a motion for summary judgment, the non-moving party must "set out specific facts," supported by admissible evidence, that show "a genuine issue for trial."  *Id.*  As the Supreme Court has stated in oft-quoted language, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.   *Tuccio I*

*Tuccio I*, filed on behalf of Tuccio Development, asserts only a "class of one" equal protection claim against the Town of Brookfield; the Wetlands Commission; the Planning Commission; former First Selectman Jerry Murphy; Ron Klimas, former Director of Public Works and the Town Engineer; Wetlands Enforcement Officer Katherine Daniel; Larry Miller, Chairman of the Wetlands Commission; and James Vulcano, Vice Chairman of the Wetlands Commission.[3]  *See*

---

[3]  Although Tuccio Development's Complaint was rather ambiguous as to what claims it was pursuing, it clarified in its memorandum opposing summary judgment that it asserts only a class-of-one equal protection claim.  *See Tuccio I*, Pl.'s Mem. in Opp'n to Summ. J. [doc. # 59] at 1.

*Tuccio I*, Compl. [doc. # 1].  Class-of-one equal protection claims require a plaintiff to prove that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *see also Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008).  However, while the "similarly situated" requirement uses the same language as that used in employment discrimination cases, *see, e.g.*, *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir. 2001), the standard for demonstrating sufficient similarity for class-of-one equal protection claims is much higher than in the employment discrimination context.  As the Second Circuit explained in *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006), "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves. This showing is more stringent than that used at the summary judgment stage in the employment discrimination context." (citation omitted); *see also Ruston v. Town Board for the Town of Skaneateles*, __ F.3d __, 2010 WL 2680644, at *3 (2d Cir. July 8, 2010).

> Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Clubside*, 468 F.3d at 159 (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005)); *see also Blackhawk Sec., Inc. v. Town of Hamden*, No. 03CV2101(MRK), 2005 WL 1719918, at *3-5 (D. Conn. July 22, 2005).

In its Complaint, Plaintiff Tuccio Development alleges that:

Defendants have subjected plaintiff to a pattern of harassment and abuse designed

and intended to inflict substantial economic injury upon the plaintiff with respect to its Whispering Glen development, including: arbitrarily and irrationally increasing the bond which the plaintiff was required to post in connection with the subdivision, issuance of meritless cease-and-desist orders, requiring the plaintiff to undertake needless studies and evaluations of aspects of the development already approved, requiring the plaintiff's officers, attorneys and/or contractors to appear needlessly at public meetings, delaying irrationally and unreasonably the approval of various aspects of the project and at other times refusing to meet or communicate with the plaintiff or its attorneys and/or officers when such communication was necessary and appropriate in the public interest.

*Tuccio I*, Compl. [doc. # 1] ¶ 8.

Defendants make three principal arguments for summary judgment on Plaintiff's class-of-one equal protection claim. *See Tuccio I*, Defs.' Mem. in Supp. of Summ. J. [doc. # 56]. First, they argue that Plaintiff's claim cannot be based on any conduct that occurred on or before December 21, 2007 due to the release the parties signed as part of the Stipulated Judgment resolving the State Court Action. *See id.* at 20-22. Next, Defendants make two arguments on the merits, arguing first, that Plaintiff has not identified any sufficiently similarly-situated entity that was treated differently; and second, that even if it has, there is no evidence that the Defendants intentionally treated Plaintiff differently or that their actions were irrational or motivated by malice or an otherwise improper motive. *See id.* at 27-32.

Plaintiff makes two arguments with regard to the release: first, that it ran only to the Town of Brookfield, and did not pertain to any of the individual Defendants, *see Tuccio I*, Pl.'s Mem. in Opp'n to Summ. J. [doc. # 59] at 6-7; and second, that the General Release is invalid because of the "excessive coercion utilized by the Town in forcing the execution of the document," *id.* at 7. On the merits of the equal protection claim, Plaintiff argues that the Hamlin Court project, to which it compares itself, is sufficiently "identical" to meet the exacting class-of-one standard. *See id.* at 7-8.

The Court will consider each argument in turn. As discussed below, neither has any merit.

## A.

The Connecticut Supreme Court has advised that:

> A release is an agreement to give up or discharge a claim. It terminates litigation or a dispute and [is] meant to be a final expression of settlement. . . . A release acts like a contract and, as with any contract, requires consideration, voluntariness and contractual capacity. . . . [T]he document ensures the released tortfeasor that he has bought his peace. Accordingly, [r]eleases and settlements . . . represent a surrender of a cause of action, perhaps for a consideration less than the injury received, but, nevertheless, a surrender pursuant to an agreement.

*Viera v. Chen*, 283 Conn. 412, 427-28 (2007) (citation and quotation marks omitted, all but third alteration in original). Since they are a species of contract, releases are interpreted under Connecticut law just like any other contract. *See id.*; *HLO Land Ownership Assoc. Ltd. P'ship v. Hartford*, 248 Conn. 350, 356 (1999) ("[It is a] well established principle that . . . a stipulation of the parties is to be regarded and construed as a contract."); *see also Torres v. Walker*, 356 F.3d 238, 245 (2d Cir. 2004) ("Settlement agreements are contracts and must therefore be construed according to general principles of contract law.") (quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999)); *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) ("It is well established that settlement agreements and general releases are contracts construed according to general principles of contract law.") (internal citations and quotation marks omitted); *Johnson v. Schmitz*, 237 F. Supp. 2d 183, 188-192 (D. Conn. 2002) (discussing releases generally with regard to Connecticut law).

As mentioned above, the Stipulated Judgment required the release. More specifically, that part of the Stipulated Judgment provides the following:

> Upon the acceptance of this stipulation by the Court, all Plaintiffs, including their officers, and Arthur Tuccio and Edward Tuccio, individually, shall execute and deliver general releases releasing the Town of Brookfield, the Brookfield Planning Commission, the Brookfield Inland Wetlands Commission, *and their respective*

> *officers, members, commissioners, employees, and agents*, and Francis J. Collins, Thomas W. Beecher and the law firm of Collins, Hannafin, Garamella, Jaber & Tuozzolo from any and all claims which exist or which may exist as a result of any and all matters concerning the Whispering Glen Subdivision, including matters concerning the application or enforcement of the subdivision regulations, the wetland regulations, any Town road or driveway ordinance: and any matter that is the subject of this litigation.

Stipulated Judgment, Ex. G to Sienkiewicz Aff. [doc. # 57-4] ¶ 11 (emphasis added).  The same day that the Stipulated Judgment was entered, all parties signed the General Release.  *See* General Release, Ex. H to Sienkiewicz Aff. [doc. # 57-4].  The relevant language in the General Release provides the following:

> Know Ye, That TUCCIO DEVELOPMENT, INC., . . . TUCCIO CUSTOM HOMES, LLC, . . . D & T GUERRA, LLC, . . . ARTHUR TUCCIO, JR, . . . EDWARD TUCCIO, . . . and TINA TUCCIO GUERRA, . . . hereinafter collectively designated as the "Releasors", for a valuable consideration received to their full satisfaction of the TOWN OF BROOKFIELD, . . . and the PLANNING COMMISSION OF THE TOWN OF BROOKFIELD, the BOARD OF SELECTMEN OF THE. TOWN OF BROOKFIELD and the INLAND WETLANDS COMMISSION OF THE TOWN OF BROOKFIELD, duly authorized agencies of said Town of Brookfield, . . . *and its and their respective officers, members, commissioners, employees and agents, hereinafter collectively designated as the "Releasees"*,

> have remised, released and forever discharged and by these presents do remise, release and forever discharge the said Releasees of and from all debts, obligations, reckonings, controversies, suits, actions, causes of actions, trespasses, damages, in law or in equity, which against the said Releasees, the Releasors ever had, now have or hereafter can, shall, or may have, for upon or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the day of the date of these presents, arising out of or in connection with:

> the development or subdivision of land known as Whispering Glen Subdivision . . . including, but not limited to actions of the Releasees, or any of them: a) concerning the development or construction of on any lots located within said Subdivision; b) concerning the development or construction of Subdivision improvements (e.g., roads, drainage facilities, detention basins, etc.), c) concerning the application or enforcement of land use regulations, including zoning, wetlands and subdivision regulations, d) concerning the application or enforcement of construction standards with respect to said Whispering Glens Subdivision, e) concerning the application or

enforcement of Town ordinances, including Town road and driveway ordinances, f) concerning the issuance and prosecution of and enforcement orders, including cease and desist orders, g) concerning the decisions to call the subdivision bond posted with respect to Whispering Glen Subdivision, h) concerning the filing of a notice of termination of subdivision on the land records by the Town of Brookfield, i) concerning any consideration of, or motions or correspondence concerning, the Whispering Glen Subdivision or the actions of Releasees with respect to same, and j) concerning those matters that give rise to the claims of the Releasors as set forth in [the State Court Action].

*Id.* at 1-2 (emphasis added).

Given the italicized language quoted above, Plaintiff cannot plausibly argue that the General Release does not apply to *all* of the Defendants in this action, including the individual Defendants. Although one could read Plaintiff to argue that the General Release applies only to the individual Defendants in their *official* capacities – and not in their personal capacities – this argument also fails. Not only would that contention require reading language into the General Release that nowhere appears, *see HLO*, 248 Conn. at 357 ("A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity.") (citation omitted), but it would render the release essentially worthless to the individual Defendants, for they already had immunity for actions taken in their official capacities.  *See, e.g.*, *Taylor v. Windsor Locks Police Department*, 71 Fed. Appx. 877, 879 (2d Cir. 2003) (summary order); *Moore-Bey v. DelRosario*, 21 Fed. Appx. 467, 470 (7th Cir. 2001) (unpublished) ("[I]f the release discharged the defendants in only their official capacities, then its terms would be meaningless because the Eleventh Amendment bars federal suits for damages against state officers in their official capacities."); *Pekarsky v. Ariyoshi*, 695 F.2d 352, 354 (9th Cir. 1982) (holding that a release that merely referred to the defendants by their names was "in no way limited to dismissal in their individual capacities.  The defendants were sued in their dual capacities, and reference to them by name only, without specifying one capacity or the other, is most

reasonably construed as reference to both capacities."); *Robertson v. Hecksel*, No. 1:03CV10, 2004 WL 5544648, at *2 (N.D. Fla. Apr. 14, 2004) ("Courts that have confronted whether a settlement agreement, reached between a party and a governmental actor, that is silent regarding whether the action may proceed against the governmental actor in his or her individual capacity, have held that the most logical reading of such a settlement agreement is that it was intended to encompass both the governmental actor's individual and official capacities.  The Court concurs.").

The General Release is unambiguous on its face and clearly encompasses matters that Plaintiff now wishes to argue support its equal protection claim.  *See Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 463 (2d Cir. 1998) ("[A] release that is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced."); *Kemnitz v. Trans World Airlines, Inc.*, 131 F.3d 131, 1997 WL 741383, at *1 (2d Cir. 1997) (unpublished) ("When plaintiff assented to the proposed settlement in conference with the court, answering affirmatively the court's question whether the settlement met with his approval, a binding contract was formed."). Accordingly, the General Release precludes Plaintiff from basing any claim against any of Defendants for their conduct prior to December 21, 2007.

As mentioned, Plaintiff also argues that the General Release is invalid.  Its  argument is:

[B]ased on the excessive coercion utilized by the Town in forcing the execution of that document.  For example, a principal and co-owner of the plaintiff was prohibited from even participating in the settlement discussions, was not all allowed in the room, and is not a signatory to the alleged agreement. The agreement, moreover, was coerced by some of the very kinds of abuses of official power which are the subject of this lawsuit.

*Tuccio I*, Pl.'s Mem. in Opp'n to Summ. J. [doc. # 59] at 7.

The Tuccio Development principal/co-owner that was apparently not permitted to participate in the settlement negotiations was Edward Tuccio.  It is true that he did not sign the Stipulated

21

Judgment; his brother, Arthur Tuccio, Jr., signed on behalf of Tuccio Development and Tuccio Custom Homes, LLC, and his sister, Tina Guerra, signed for D&T Guerra, LLC.  *See* Stipulated Judgment, Ex. G to Sienkiewicz Aff. [doc. # 57-4].  It is also the case that Plaintiff denies that Arthur Tuccio was speaking or had the authority to speak on behalf of Tuccio Development at the hearing.  *See Tuccio I*, Pl.'s Local Rule 56(a)2 Statement [doc. # 58] ¶ 57.  However, there are innumerable problems to the argument that the Stipulated Judgment or General Release is invalid for coercion, all of which boil down to the fact that there is simply no evidence to support such a contention.

First, though he did not sign the Stipulated Judgment, Edward Tuccio did sign the General Release (along with his siblings, who signed for the companies).  *See* General Release, Ex. H to Sienkiewicz Aff. [doc. # 57-4].  If Edward Tuccio believed that his brother did not have the authority to sign on behalf of Tuccio Development, one would have thought that he would have been disturbed by the space in the General Release calling for Arthur Tuccio to sign on Tuccio Development's behalf.  *See id.*

Second, while Edward Tuccio did testify that he was not allowed in the room when the final stipulation was being negotiated, his deposition testimony: (a) establishes that this did not matter, as he was clearly in favor of the agreement and would have signed it; and (b) nowhere supports the proposition that Arthur Tuccio did not have the authority to speak on behalf of Tuccio Development during the hearing.  Edward Tuccio testified at his deposition as follows:

| | |
|---|---|
| **Question:** | Were you in the Danbury courthouse on the day that your brother signed this document [the Stipulation]? |
| **E. Tuccio:** | I was in the building.  I was told to stay away from this meeting. |

22

| | |
|---|---|
| **Question:** | And who told you to stay away from the meeting? |
| **E. Tuccio:** | Mr. Klimas and Mr. Sienkiewicz. |
| **Question:** | And what did they say to you? |
| **E. Tuccio:** | "We don't want Eddie in here." |
| **Question:** | And where were you when that was said? |
| **E. Tuccio:** | I was outside the door in the meeting room that they were going into. |
| **Question:** | Was Mr. Sensale in that room? |
| **E. Tuccio:** | I don't know.  I wasn't in the room. |
| **Question:** | Was Mr. Sensale in the courthouse that day? |
| **E. Tuccio:** | I believe so.  We had a bunch of lawyers. |
| **Question:** | Okay.  And did your lawyers taken any steps to address the fact that you were told by Mr. Klimas and others that you couldn't be in the room? |
| **E. Tuccio:** | We wanted this issue resolved so we could close on a house that they weren't allowing us to close on.  We would have signed any document, okay, which this is a terrible document, but it's not as terrible as not closing on a house that they had total control of us whether we're going to close or not. . . . |
| **Question:** | Okay. |
| **E. Tuccio:** | That's my answer. |

E. Tuccio Cont. Dep. on Oct. 21, 2009 [doc. # 58-5] at 69-70.  As indicated, Tuccio Development was represented by an attorney in connection with the Stipulated Judgment, and everyone at the hearing – including Judge Mintz – stated that they believed the stipulation to be fair and equitable under the circumstances.  Elsewhere in his deposition testimony, Edward Tuccio reiterated that he believes that Tuccio Development was pressured into signing the Stipulation, but he identifies a bad economy as the source of the duress that the company felt.  *See, e.g.*, *id.* at 158-59 ("I would have

signed anything at that point to close on a house in a terrible economy. . . . We had to close on a house.").  In other words, Edward Tuccio's deposition testimony suggests nothing more than that Tuccio Development made a calculated decision, based on a cost-benefit analysis, that it was better to settle its claims with the Town of Brookfield rather than continuing with the state-court litigation. That Tuccio Development was operating in a difficult economic climate does not mean that the deal was coerced.

Moreover, even if there was coercion in the initial signing of the agreement – and there is no evidence of that – the State Court Plaintiffs (including the only plaintiff in *Tuccio I*) have ratified the Stipulated Judgment by their subsequent conduct.  *See, e.g.*, *Tung v. Texaco, Inc*., 32 F. Supp. 2d 115, 118 (S.D.N.Y. 1997) ("[A] plaintiff who accepts and neither returns nor offers to return the consideration  he or she has received for consideration for executing a release, is deemed to have ratified the Release and is thereby barred from challenging its validity."), *aff'd in part and vacated in part*, 150 F.3d 206, 208 (2d Cir. 1998); *see also Livingston v. Bev-Pak, Inc*., 112 F. Supp. 2d 242, 249 (N.D.N.Y. 2000) ("[E]ven if Plaintiff did not knowingly and voluntarily execute the release agreement, he has since ratified the agreement by inaction.").  Indeed, nearly six months after the Stipulated Judgment was entered, the parties to the State Court Action jointly moved to amend a section of that judgment to permit Tuccio Development to post the $45,000 bond in cash instead of a letter of credit. *See* Ex. I to Sienkiewicz Aff. [doc. # 57-4].  That action casts serious doubt on the claim advanced here that the State Court Plaintiffs ever believed that the Stipulated Judgment was void for any reason.

At *most*, the evidence suggests that the State Court Plaintiffs made a deliberate choice to settle their claims, a course of action that they now regret.  However, regret is simply not a reason to

not enforce the General Release.  *See United States v. Bank of New York*, 14 F.3d 756, 759 (2d Cir. 1994) ("When a party makes a deliberate, strategic choice to settle, she cannot be relieved of such a choice merely because her assessment of the consequences was incorrect."); *King v. Tully Const. Co., Inc.*, No. 98CV3535, 2001 WL 984910, at *1 (E.D.N.Y. July 9, 2001) ("A party that chooses to settle cannot be relieved of such a choice merely because its assessment of the decision to settle was incorrect.").

Moreover, the evidence arguably does not even suggest regret.  Not only does Edward Tuccio admit in his deposition that the State Court Plaintiffs never fulfilled the requirements of the Stipulated Judgment, he also suggests that they never had any intention of doing so.  *See, e.g.*, E. Tuccio Cont. Dep. on Oct. 21, 2009 [doc. # 58-5] at 79-80, 159-61, 208-210 (admitting that the work required by the Stipulated Judgment was not done, explaining that the Bridge had been implicitly approved by Mr. Klimas years before and that Tuccio Development decided not "to give in to terrorism"); E. Tuccio Cont. Dep. on Nov. 28, 2009 [doc. # 57-11] at 216, 227-29; *see also id.* at 248-49 (testifying that in September 2008, Tuccio Development transferred subdivision lots to companies with the same owners "to hopefully get by them terminating the subdivision again").

By choosing to settle the claims it brought in the State Court Action, Tuccio Development was able to forestall the termination of the subdivision and the calling of the Bond by some 16 months. In the interim, it refused to undertake the commitments to which it agreed in the Stipulated Judgment.  Having received the benefit of its bargain, Tuccio Development may not now argue that the agreement itself is unenforceable.  *See Pampillonia*, 138 F.3d at 463; *Tung*, 32 F. Supp. 2d at 118.  Accordingly, the General Release precludes Plaintiff from basing any claim against any of Defendants for their conduct prior to December 21, 2007.

**B.**

Even if the General Release could not be enforced – and it can – that would not change the outcome of this case, as the Plaintiff has failed to identify a sufficiently-similar comparator for its class-of-one equal protection claim. *See Ruston*, 2010 WL 2680644, at *3; *Clubside*, 468 F.3d at 159. Plaintiff's claim centers on two primary disputes: (1) the Bridge, particularly Mr. Klimas' alleged implicit approval of the Bridge in its non-conforming state, and then the Planning Commission's subsequent reversal; and (2) the idea that Defendant Miller was the driving force behind the actions of both the Wetlands Commission and Ms. Daniel, even after he "pretended" to recuse himself. The lack of a comparator is discussed in a moment, but it is important to note that there is absolutely no evidence to support Plaintiff's account of either of these disputes.

With regard to the Bridge – and even assuming that this claim could be premised on the Defendants' conduct vis-à-vis the Bridge in light of the General Release – Plaintiff has presented no evidence that Mr. Klimas approved the Bridge, even implicitly. Instead, Plaintiff presents only Edward Tuccio's speculative testimony that Mr. Klimas would have said something if he thought the Bridge was a problem. *See* E. Tuccio Cont. Dep. on Oct. 28, 2009 [doc. # 58-6] at 208-210. This is only speculation, and certainly does not establish that Mr. Klimas actually "approved" the Bridge – even assuming that he had the authority to do so, about which the record is unclear. Moreover, when Plaintiff sought release of the Bond, Mr. Klimas certainly made his views regarding the Bridge known to Plaintiff.

Plaintiff's evidence regarding Mr. Miller's alleged failure to actually recuse himself from Wetlands Commission matters relating to the Whispering Glen subdivision is even more speculative, as it is comprised entirely of Edward Tuccio's bald, unsupported assertion that he believed that Mr.

26

Miller was pulling strings behind the scene.  *See* E. Tuccio Dep. on Dec. 7, 2009 [doc. # 57-12] at 13-15 (admitting that he has no evidence that Mr. Miller ever communicated with any other defendant about the Whispering Glen subdivision).  In sum, while the Court does not discount the *possibility* that the Defendants treated Tuccio Development unfairly – and Edward Tuccio, at least, clearly believes that to be the case – Plaintiff has not presented any evidence of that fact beyond Mr. Tuccio's base speculation.  Conjecture is simply insufficient to defeat summary judgment.  *See* Fed. R. Civ. P. 56(e)(2).

What is more, the only comparator Plaintiff has identified in support of its class-of-one equal protection claim (in either *Tuccio I* or *II*) is the Hamlin Court project, *see Tuccio I*, Pl.'s Local Rule 56(a)2 Statement [doc. # 58] at 15 ¶ 41; *Tuccio II*, Pl.'s Local Rule 56(a)2 Statement [doc. # 40] at 13 ¶ 30, which is not sufficiently similar to be a proper comparator for a "class of one" claim. Hamlin Court is a residential subdivision that was approved by the Planning Commission on May 2, 1996.  *See* Klimas Aff. [doc. # 57-3] ¶ 26.  The Hamlin Court project had no watercourse or bridge, *see id.* ¶ 27, and most importantly, the developers did not fail to construct a structure to the specifications required by its approved plan, *see id.* ¶ 28.  Nor was there anything comparable to the Stipulated Judgment in the Hamlin Court project.

As with Whispering Glen, the Hamlin Court developers requested, at one point, the release of the bond that was posted as security of the required construction; and as with Whispering Glen, Mr. Klimas recommended that the bond not be released because of certain defects.  *See id.* ¶ 30.  Despite the Hamlin Court developers' representation on November 3, 2000 that "all required work had been completed," *see* Letter dated Nov. 3, 2000, Ex. D to Klimas Aff. [doc. # 57-3], that turned out not to be the case when Mr. Klimas inspected the development.  Mr. Klimas observed two problems: an "as

built" road had not been submitted by the developer and drainage discharge pipes had not been constructed per the plans.  Therefore, in his memo dated December 5, 2000, Mr. Klimas stated that: "I do not recommend the Final Release and Acceptance of Hamlin Court in the Town Road System until the above two items have been addressed."  Klimas Aff. [doc. # 57-3] ¶ 33; Klimas Mem. of Dec. 5, 2000, Ex. E. to Klimas Aff.  At the January 4, 2001 Planning Commission meeting, Mr. Klimas reported that the "as built" of the road had been submitted, but the discharge pipe issue had still not been addressed; the Planning Commission therefore voted not to recommend the release of the full bond as requested by the developer.  *See* Klimas Aff. [doc. # 57-3] ¶ 34.  Between that meeting and August 6, 2001, the Planning Commission made additional specific requests, with which the developers complied.  *See id.* ¶ 35.  By letter dated June 22, 2001, the developers confirmed their compliance.  *See id.* ¶ 35; Letter dated June 22, 2001, Ex. F to Klimas Aff.  Only then was the developers' bond released.

Plaintiff attempts to manufacture a dispute here with testimony from Mr. Martinez, a land surveyor, to the effect that the Hamlin Court project's final state did not meet the specifications of its approved plan.  *See* Martinez Dep. [doc. # 58-3].  However, these alleged variances are highly-technical issues of which there is simply no evidence that either Mr. Klimas or the Planning Commission ever had notice.  For example, Mr. Martinez testifies that the "catch basins" were too far apart – instead of being placed within 250 feet of each other, one was some 267 feet from another. *See id.* at 52-54.  Perhaps someone from the Town should have measured this distance, but this minor variance, evidenced only upon careful measurement, is materially different from the Bridge at issue here, whose variance from the Approved Plan's specifications was far more obvious.  At base, without evidence that Mr. Klimas or the Planning Commission were aware of, yet ignored,

the ways in which the Hamlin Court project did not adhere to its approved plan – and there is no such evidence – these variances simply cannot support the claim that Tuccio Development was treated differently with respect to the Bridge in Whispering Glen.  *See Clubside*, 468 F.3d at 159 (explaining that "the similarity in circumstances and difference in treatment" between a class-of-one plaintiff and the alleged comparator "[must be] sufficient to exclude the possibility that the defendants acted *on the basis of a mistake*.") (emphasis added, citation omitted).

Moreover, any disparate treatment by Ms. Daniel cannot be based on the Hamlin Court project, as it was completed in August 2001 – approximately five years before she was hired as the Wetlands Enforcement Officer.  *See* Daniel Aff. [doc. # 57-1] ¶ 34.  Finally, while Tuccio Development disparages Mr. Heynen (the geotechnical engineer who evaluated the Bridge following the Stipulated Judgment) and his firm, the same firm was used by the Town on at least two other similar occasions between 2006 and 2009.  *See* Klimas Aff. [doc. # 57-3] ¶ 36.  In both instances, the firm made recommendations regarding development projects, which the owners of the projects agreed with and implemented.  *See id.*

In sum, since Plaintiff has failed to identify a sufficiently-similar comparator that the Defendants treated differently, no reasonable jury could find for it on its class-of-one equal protection claim.  Therefore, the *Tuccio I* Defendants' Motion for Summary Judgment [doc. # 55] is GRANTED.

## IV.    *Tuccio II*

The *Tuccio II* plaintiffs – Tuccio Development; D&T Guerra, LLC; Tuccio 7, LLC; and Tuccio Custom Homes, LLC – assert two claims against Defendants Town of Brookfield; the Wetlands Commission; Mr. Miller; Mr. Vulcano; Ms. Daniel; and Mr. Klimas.  Those claims are a

29

class-of-one equal protection claim and a First Amendment retaliation claim.[4]  Plaintiffs' class-of-one equal protection claim is premised on the same allegations and arguments already discussed with regard to *Tuccio I*.  Therefore, the Court will not repeat them here.  Suffice it to say that the *Tuccio II* class-of-one equal protection claim fails on the merits for the same reasons it fails in *Tuccio I*, and summary judgment is GRANTED to the *Tuccio II* Defendants on the equal protection claim for the same reasons.

The Court will next consider Plaintiffs' First Amendment retaliation claim.  Plaintiffs' First Amendment claim alleges that the Defendants retaliated against them for the filing of *Tuccio I*.  *See Tuccio II*, Compl. [doc. # 1] ¶ 28.  Plaintiffs allege that two of Defendants' actions were retaliatory: the order to reconstruct the Bridge, issued by way of Mr. Klimas' notice on September 5, 2008 of Mr. Heynen's report and recommendations; and the Cease & Restore Order issued by Ms. Daniel on September 9, 2008.

> In order to survive summary on § 1983 First Amendment retaliation claim,
>
> [A] plaintiff must demonstrate that he engaged in protected speech, and that the speech was a substantial or motivating factor in an adverse decision taken by the defendant.  Specific proof of improper motivation is required to survive summary judgment on a First Amendment retaliation claim.  Even if the plaintiff demonstrates these factors, the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse . . . . action even in the absence of the protected conduct.

*Sullivan v. Stein*, 487 F. Supp. 2d 52, 84-85 (D. Conn. 2007) (citations and quotation marks omitted, last alteration in original); *see also Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Cotarelo v. Sleepy Hollow Police Dep't*, 460 F.3d 247, 251-52 (2d Cir. 2006); *Beechwood Restorative Care Ctr. v.*

---

[4] The *Tuccio II* Complaint also alleged claims of breach of contract and procedural due process, but Plaintiffs stated in their memorandum opposing summary judgment that they are no longer pursuing those claims.  *See Tuccio II*, Pl.'s Mem. in Opp'n to Summ. J. [doc. # 41].

*Leeds*, 436 F.3d 147, 152 (2d Cir. 2006); *Curley v. Vill. of Suffern*, 268 F.3d 65, 72-73 (2d Cir. 2001)

In support of their Motion for Summary Judgment as to this claim, Defendants do not dispute that the filing of *Tuccio I* constitutes speech protected by the First Amendment; rather, they argue that the retaliation claim must fail because Plaintiffs cannot produce any evidence that Defendants' conduct was motivated by Plaintiffs' filing of the first action or that Defendants' actions would not have been taken in the absence of *Tuccio I*. *See Tuccio II*, Defs.' Mem. in Supp. of Summ. J. [doc. # 38] at 29-30. In response, Plaintiffs argue that the mere temporal proximity between to the two adverse actions and the filing of *Tuccio I* supports their claim of unlawful retaliation. *See Tuccio II*, Pl.'s Mem. in Opp'n to Summ. J. [doc. # 41] at 7-8.

*Tuccio I* was filed on July 8, 2008. The two adverse actions – Mr. Klimas sending Plaintiffs notice of Mr. Heynen's report and recommendations, *see* Ex. A to Klimas Aff. [doc. # 57-3], and the Cease & Restore Order issued by Ms. Daniel, *see* Daniel Aff. [doc. # 57-1] ¶¶ 30-31 – occurred approximately two months later. While temporal proximity between protected activity and an adverse action can support an inference of unlawful retaliation, *see generally Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001); *Espinal v. Goord*, 558 F.3d 119, 129-30 (2d Cir. 2009), temporal proximity is but one factor that must be considered with all others, *see Breeden*, 532 U.S. 273-74; *Espinal*, 558 F.3d at 130; *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554-557 (2d Cir. 2001); *Oliphant v. Conn. Dep't of Transp.*, No. 02CV700, 2006 WL 3020890, at *10 (D. Conn. Oct. 23, 2006) ("The operative issue is not simply the length of time between the protected activity and the alleged retaliation but the demonstrated nexus between the two."). In this case, no reasonable jury could infer from this temporal proximity alone that either adverse action

was the product of an improper motive or that the same actions would not have been taken but for the filing of *Tuccio I*.

The undisputed facts establish that Plaintiffs agreed in the Stipulated Judgment of the State Court Action to Mr. Heynen's hire and investigation of the Bridge and to implement his recommendations within 90 days of receiving notice of those recommendations.  *See* Stipulated Judgment, Ex. G to Sienkiewicz Aff. [doc. # 57-4].  It is also undisputed that Plaintiffs received the notice of Mr. Heynen's report and recommendations called for by the Stipulated Judgment, *see* Letter dated Sept. 5, 2008 from Ron Klimas, Ex. A to Klimas Aff. [doc. # 57-3], and that they never made any effort whatsoever to implement Mr. Heynen's recommendations, *see, e.g.*, E. Tuccio Cont. Dep. on Oct. 21, 2009 [doc. # 58-5] at 79-80, 159-61, 208-210; E. Tuccio Cont. Dep. on Nov. 28, 2009 [doc. # 57-11] at 216, 227-29.  When Plaintiffs failed to fulfill their contractual commitments, Defendants acted in conformance with the procedures outlined in the Stipulated Judgment to call the Bond and terminate the subdivision – procedures that Plaintiffs had agreed were proper some six months prior to *Tuccio I*'s filing.

Given the lack of evidence that Defendants colluded with Mr. Heynen regarding the contents of his report, or that Defendants would have chosen not to enforce the bargain that they struck with Plaintiffs but for the filing of *Tuccio I* – and there is no evidence of either proposition – the Defendants enforcement of the letter of their agreement with Plaintiffs cannot support a claim of unlawful retaliation.  *See Breeden*, 532 U.S. at 273-74; *Oliphant*, 2006 WL 3020890, at * 10.  Here again, Plaintiffs cannot make an end-run around their contractual commitments simply because they do not like the consequences.  *See Bank of New York*, 14 F.3d at 759.

The only other adverse action identified by Plaintiffs as retaliatory is the September 9, 2008

32

Cease & Restore Order issued by the Wetlands Enforcement Officer, Ms. Daniel; it also cannot support a claim of retaliation.  First, it is undisputed that Ms. Daniel had the authority to issue the Cease & Restore Order under state law, *see* Conn. Gen. Stat. §§ 22a-42 & 22a-42g; municipal ordinance, *see* Town of Brookfield Inland Wetlands Comm'n Regs. § 220-12, Ex. 1 to Daniel Aff. [doc. # 57-1]; and Paragraph 9 of the Stipulated Judgment, Ex. G to Sienkiewecz Aff. [doc. # 57-4]. Second, Plaintiffs nowhere suggest or argue that the substance of the Cease and Desist Order – that Plaintiffs had maintained inadequate erosion-control measures at the Whispering Glen subdivision, which became apparent after a heavy rain, *see* Daniel Aff. [doc. # 57-1] ¶¶ 30-31 – was contrived or fabricated.  Instead, Plaintiffs complain that they were unfairly singled out for enforcement of the wetlands' regulations.  *See* E. Tuccio Dep. on Dec. 7, 2009 [doc. # 57-12] at 31-35.  But Plaintiffs have no evidentiary support for this proposition beyond Edward Tuccio's rank (and self-admitted) speculation that Ms. Daniel and the Wetlands Commission could have, but did not, enforce the wetlands' regulations as to other violators.  *See id.*; E. Tuccio Cont. Dep. on Oct. 21, 2009 [doc. 58-5] at 170, 175-76; 185-86.  Once more, speculation is insufficient to defeat summary judgment.  *See, e.g.*, *Washington v. County of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004); *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004).

Therefore, in light of Defendants' un-rebutted evidence that the Cease and Desist Order was issued because of Plaintiffs' violations of the wetlands' regulations, Defendants are entitled to summary judgment on the retaliation claim for the simple reason that Plaintiffs have not provided any non-speculative evidence suggesting that the Cease & Desist Order would not have been issued but for the filing of the first action.  *See Cotarelo*, 460 F.3d at 252-53; *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive . . . a defendant may be

entitled to summary judgment if he can show dual motivations, i.e., that even without the improper motivation the alleged retaliator action would have occurred."); *see also Rolon v. Ward*, 345 Fed. Appx. 608, 611 (2d Cir. 2009) (summary order) (discussing how factual issues regarding whether the plaintiff was treated more harshly than similarly-situated individuals can preclude summary judgment on the issue of whether defendants would have taken the same action but for the plaintiff's protected activity); *Taravella v. Town of Wolcott*, No. 3:04CV895, 2008 WL 747668, at *8-9 (D. Conn. Mar. 18, 2008) (granting summary judgment to defendants on a speech retaliation claim, despite temporal proximity, because the plaintiff failed to produce any evidence that the defendants were either motivated by the speech or would not have taken the same actions in its absence); *Hines v. City of Bristol*, No. 3:05CV1251, 2008 WL 697300, at *6-7 (D. Conn. Mar. 13, 2008) (granting summary judgment to defendant because, *inter alia*, plaintiff produced no evidence that defendants would not have taken the same actions in the absence of plaintiffs' protected speech).

In sum, since Plaintiffs have failed to adduce any evidence that Defendants actions were substantially motivated by Plaintiffs' protected speech, or that Defendants would not have taken the same actions in the absence of the protected speech, the *Tuccio II* Defendants' Motion for Summary Judgment [doc. # 37] is GRANTED.

## V.      *Tuccio III*

*Tuccio III* was brought on behalf of two plaintiffs, Tuccio Development and Tuccio Enterprises, LLC, against two defendants: the Town of Brookfield and its First Selectman, Robert G. Silvaggi.  Plaintiffs allege that Defendants violated their rights to procedural and substantive due process.[5]  *See Tuccio III*, Compl. [doc. # 1].  Plaintiffs' claims in *Tuccio III* relate solely to Mr.

---

[5] The Complaint [doc. # 1] also alleges claims of common-law conversion and statutory theft, but

Silvaggi calling the Bond on behalf of the Town on or about May 26, 2009.  Plaintiffs allege that: "[Mr.] Silvaggi falsely, knowingly and maliciously stated among other things that 'Tuccio Development, Inc., has failed to complete the bonded site work . . .' and that the Plaintiff had defaulted on its bond, and that the sum of $166,660 is 'a fair and accurate estimate of the amount necessary to remedy said default. . . .'" *Id.* ¶ 8 (alterations in original).  Plaintiffs allege further that "[t]he aforesaid actions of Defendant Silvaggi were outrageously arbitrary and shocking to the conscience," *id.* ¶ 9, and that they have caused the Plaintiffs to suffer substantial economic losses, *see id.* ¶ 10.

The Court has already discussed the sum and substance of the arguments raised in *Tuccio III* with respect to the other two cases.  As recited above, Plaintiffs either admit or provide no evidence to rebut the following facts – all of which conclusively demonstrate that: first, Plaintiffs received all the process they were due; and second, that there was nothing arbitrary or capricious about the calling of the bond.  *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756-57 (2005); *O'Connor v. Pierson*, 426 F.3d 187, 196-97 (2d Cir. 2005).

On December 21, 2007, Plaintiffs agreed in the Stipulated Judgment of the State Court Action to Mr. Heynen's hire and to implement his recommendations (if any) with regard to the Bridge within 90 days of receiving notice of those recommendations.  *See* Stipulated Judgment, Ex. G to Sienkiewicz Aff. [doc. # 57-4].  Plaintiffs received notice of Mr. Heynen's report and recommendations – including the re-building of the Bridge to the original specifications – on or about September 5, 2008.  *See* Letter dated Sept. 5, 2008 from Ron Klimas, Ex. A to Klimas Aff.

---

Plaintiffs stated in their memorandum opposing summary judgment that they have withdrawn those claims.  *See Tuccio III*, Pl.'s Mem. in Opp'n to Summ. J. [doc. # 29] at 9.

[doc. # 57-3]; Heynen Report [doc. # 57-7].  Nonetheless, Plaintiffs never undertook to perform any of the work recommended by Mr. Heynen.  *See, e.g.*, E. Tuccio Cont. Dep. on Oct. 21, 2009 [doc. # 58-5] at 79-80, 159-61, 208-210; E. Tuccio Cont. Dep. on Nov. 28, 2009 [doc. # 57-11] at 216, 227-29.  On February 9, 2009, the Planning Commission sent a letter to Tuccio Development to inform it of that the Planning Commission would hold a hearing on March 5, 2009 to consider whether to terminate the subdivision and call the Bond due to Tuccio Development's failure to complete the construction it committed to performing.  *See* Letter dated Feb. 9, 2009, Ex. K to Sienkiewicz Aff. [doc. # 57-4].  The show cause hearing took place on March 5, 2009, which Tuccio Development made a strategic decision *not* to attend – to "risk it," as Edward Tuccio testified.  *See* E. Tuccio Cont. Dep. on Nov. 28, 2009 [doc. # 57-11] at 233-34.

At the show cause hearing, the Planning Commission heard from Mr. Klimas that Tuccio Development had not undertaken to perform any of the work recommended by Mr. Heynen. Thereafter, the Planning Commission approved a resolution terminating the subdivision and calling the Bond.  *See* Minutes of March 5, 2009 Planning Commission Meeting, Ex. C to Klimas Aff. [doc. # 57-3]; Sienkiewicz Aff. [doc. # 57-4] ¶ 32.  The Planning Commission then directed the Town Engineer – Ralph Mr. Tedesco, as of April 1, 2009 – to prepare an estimate of the cost to make the required improvements and repairs, which he did.  *See* Sienkiewicz Aff. [doc. # 57-4] ¶ 34.  Mr. Tedesco estimated that the cost would exceed the combined amounts of the letter of credit and cash bond, *see Tuccio III*, Tedesco Aff. [doc. # 27-9], and therefore Mr. Sienkiewicz drafted a letter for Mr. Silvaggi's signature stating that all of the security posted by Tuccio Development was needed to make the improvements.  *See* Sienkiewicz Aff. [doc. # 57-4] ¶ 37; Letter, Ex. M. to Sienkiewicz Aff. [doc. # 57-4].

36

In the face of these undisputed facts, Plaintiffs argue, in essence, that their rights to substantive due process were violated because Mr. Silvaggi did not make an independent investigation regarding whether Plaintiffs had actually performed the work required by the bond agreement.  *See Tuccio III*, Pls.' Mem. in Opp'n to Summ. J. [doc. # 29] at 6-7.  But given all of the aforementioned undisputed facts, Plaintiffs never explain why this matters or what, exactly, is arbitrary or conscience-shocking about Mr. Silvaggi's reliance on the representations of the town boards, attorneys and personnel to the effect that Tuccio Development had forfeited the bond by failing to perform the agreed-upon work – especially where, as here, all evidence in the record demonstrates that those representations were true.

There are other problems with Plaintiffs' claims in *Tuccio III*, but perhaps the most serious is the failure to explain what was arbitrary or conscience-shocking about holding Tuccio Development to its contractual commitments.  Accordingly, the *Tuccio III* Defendants' Motion for Summary Judgment [doc. # 24] is GRANTED.  *See O'Connor*, 426 F.3d at 196-97.

## VI.  Conclusion

For the foregoing reasons, the Defendants' Motion for Summary Judgment [doc. # 55] in *Tuccio I*, No. 08cv1016; the Defendants' Motion for Summary Judgment [doc. # 37] in *Tuccio II*, No. 08cv1610; and the Defendants' Motion for Summary Judgment [doc. # 24] in *Tuccio III*, No. 09cv898, are all GRANTED, and the clerk shall close these files.

IT IS SO ORDERED.


/s/ Mark R. Kravitz
United States District Judge


**Dated at New Haven, Connecticut:  July 14, 2010.**